## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————————
|  | : |  |
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | 05 CV 11805 NMG |
| RICHARD F. SELDEN, | : | |
| | : | |
| Defendant. | : | |
———————————————————————————

### PLAINTIFF'S MOTION FOR ENTRY OF FIVE-YEAR BAR ORDER

Plaintiff, the Securities and Exchange Commission ("SEC"), herby moves pursuant to Paragraph V of the final judgment for an order barring defendant Richard F. Selden from serving as an officer or director of a public company for five years. Grounds for this motion are set forth in the accompanying memorandum of law.

### REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(D), the Commission hereby requests oral argument in support of this motion.

Respectfully submitted,
**SECURITIES AND EXCHANGE COMMISSION,**

By its attorneys,

/s/ R.M. Harper II
————————————————————
Frank C. Huntington (BBO No. 544045)
  Senior Trial Counsel
Richard M. Harper II (BBO No. 634782)
  Senior Trial Counsel
Robert B. Baker (BBO No. 654023)
  Staff Attorney
33 Arch Street, 23rd Floor

Boston MA 02110
(617) 573-8900
(617) 573-4590 (facsimile)

Dated: September 2, 2008

## CERTIFICATE OF SERVICE

I, Richard M. Harper II, certify that on September 2, 2008, the forgoing Plaintiff's Motion for Entry of Five-Year Bar Order was filed electronically with the Court. Notice will be sent by email to all parties through the Court's electronic filing system, and the filing may be accessed through the Court's system. In addition, the undersigned has caused a paper copy to be served by first-class mail to defendant's counsel of record:

Justin J. Daniels, Esq.
Thomas J. Dougherty, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Beacon Street
Boston, Massachusetts  02108

*Attorneys for defendant Richard F. Selden*


/s/R.M. Harper II
Richard M. Harper II

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| | : |
| v. | :   Civil Action No. |
| | :   05 CV 11805 NMG |
| RICHARD F. SELDEN, | : |
| Defendant. | : |

## DECLARATION OF RICHARD M. HARPER II, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF FIVE-YEAR BAR ORDER

Richard M. Harper II, Esq., hereby declares, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am an attorney and a member in good standing of the bars of the Commonwealth of Massachusetts and the State of Hawaii.  I am a Senior Trial Counsel in the Boston Regional Office of plaintiff Securities and Exchange Commission (the "Commission"), and counsel to the Commission in this enforcement action.

2.     Attached as Exhibit A is a true and accurate copy of the 2007 Annual Report for Network Biosystems, Inc., which was filed with the Massachusetts Secretary of State's Office on January 14, 2008.

3.     Attached as Exhibit B is a true and accurate copy of the Network Biosystems, Inc. "Home" Webpage, located at http://www.networkbiosystems.com/default.asp.

4.    Attached as Exhibit C is a true and accurate copy of Transkaryotic

Therapies, Inc.'s Form 8-K Current Report and Exhibit 99.1, filed with the Commission

on January 4, 2001.

5.    Attached as Exhibit D is a true and accurate copy of pages 1-12, 93-100,

and 145-60 of the deposition testimony of Thomas J. Schuetz, M.D.


Executed under the pains and penalties of perjury this 2nd day of September, 2008,
at Boston, Massachusetts.


_R.M. Harper II_
Richard M. Harper II, Esq.

2

# EXHIBIT A



## The Commonwealth of Massachusetts
## William Francis Galvin

**Minimum Fee: $100.00**

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

## Annual Report
(General Laws, Chapter 156D, Section 16.22; 950 CMR 113.57)

---

Federal Employer Identification Number: <u>043525704</u> *(must be 9 digits)*

---

1. Exact name of the corporation: <u>NETWORK BIOSYSTEMS, INC.</u>

---

2. Jurisdiction of Incorporation:  State: <u>DE</u>   Country: <u>USA</u>

---

**3,4. Street address of the corporation registered office in the commonwealth and the name of the registered agent at that office:**

| | |
|---|---|
| Name: | <u>DAVID CHAO</u> |
| No. and Street: | <u>1 B GILL ST.</u> |
| City or Town: | <u>WOBURN</u>   State: <u>MA</u>   Zip: <u>01801</u>   Country: <u>USA</u> |

---

**5. Street address of the corporation's principal office:**

| | |
|---|---|
| No. and Street: | <u>1 B GILL ST.</u> |
| City or Town: | <u>WOBURN</u>   State: <u>MA</u>   Zip: <u>01801</u>   Country: <u>USA</u> |

---

**6. Provide the name and business street address of the officers and of all the directors of the corporation:**
*(A president, treasurer, secretary and at least one director are required.)*

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| PRESIDENT | MARY CONSALVI | 564 MCKINLEY TERRACE<br>CENTERPORT, NY 11721 USA |
| TREASURER | MARY CONSALVI | 564 MCKINLEY TERRACE<br>CENTERPORT, NY 11721 USA |
| SECRETARY | MARY CONSALVI | 564 MCKINLEY TERRACE<br>CENTERPORT, NY 11721 USA |
| CEO | RICHARD F SELDEN PH.D | 21 HUCKLEBERRY HILL<br>LINCOLN, MA 01773 USA |
| DIRECTOR | GARY MAGNANT PH.D. | 47 FOX RUN ROAD<br>TOPSFIELD, MA 01983 USA |
| DIRECTOR | PAUL MATSUDAIRA PH.D | 78 NONATUM ST.<br>NEWTON, MA 02458 USA |

---

**7. Briefly describe the business of the corporation:**

<u>DEVELOPMENT STAGE BIOTECH/HIGH TECH COMPANY</u>

---

**8. Capital stock of each class and series:**

0-4764-0

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares* | *Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|---|
| CWP | $0.01000 | 400,000 | $4,000.00 | 121,263 |

**9. Check here if the stock of the corporation is publicly traded:** __

**10. Report is filed for fiscal year ending:** 12/31/ 2007

Signed by  **MARY CONSALVI** , its  **PRESIDENT**
on this **14 Day of January, 2008**

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

# EXHIBIT B

HOME

CONTACT US

Network Biosystems is a development stage
biotech/high tech company developing nanotechnology
and microfluidics for DNA analysis in clinical, forensic,
and genomic applications. Privately held and founded
based on pioneering research performed at MIT's
Whitehead Institute, NetBio fuses microelectronics and
biotechnology to build "bio/nanotech" systems that
sense and manipulate the physical world.

The Company has several broadly enabling technology
platforms, all based on the integration of
nanotechnology and microfluidics with biotechnology
and molecular biology:

- **Clinical Diagnostics:** Network Biosystems
  believes that the real-time sequencing of patient
  samples in the hospital laboratory will have a
  dramatic impact on clinical decision making.
- **Forensics:** Network Biosystems is
  commercializing a rugged, portable STR
  identification instrument that functions both at
  the crime scene as well as the forensic
  laboratory.
- **Homeland Security:** Network Biosystems'
  instrumentation for the rapid, on-site screening
  of large numbers of individuals has a broad
  application to homeland security.
- **Genomic Sequencing:** Large scale, high capacity
  sequencing of the human genome in the
  academic and pharmaceutical settings.

For further information, please contact:

Mary Consalvi, President
Phone +1 (781) 938-6014
Email mary@networkbiosystems.com

**Network Biosystems**                                              www.networkbiosy
1 Gill Street, Suite B   Woburn, MA 01801 USA   781-938-6060 T   781-938-6062 F

# EXHIBIT C

```
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>a2034566z8-k.txt
<DESCRIPTION>FORM 8-K
<TEXT>

<PAGE>
```

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported): JANUARY 3, 2001

TRANSKARYOTIC THERAPIES, INC.
--------------------------------------------------------------------------------
(Exact Name of Registrant as Specified in its Charter)

DELAWARE
-----------------------------------------------------------------
(State or Other Jurisdiction of Incorporation)

| 000-21481 | 04-3027191 |
|-----------|------------|
| (Commission File Number) | (IRS Employer Identification No.) |

195 ALBANY STREET, CAMBRIDGE, MASSACHUSETTS          02139
--------------------------------------------------------------------------------
(Address of Principal Executive Offices)          (Zip Code)

(617) 349-0200
--------------------------------------------------------------------------------
Registrant's Telephone Number, Including Area Code

NOT APPLICABLE
--------------------------------------------------------------------------------
(Former Name or Former Address, if Changed Since Last Report)

```
<PAGE>
```

Item 5.   OTHER EVENTS.
          ------------

On January 3, 2001, Transkaryotic Therapies, Inc. ("TKT") announced that it has received a complete review letter from the U.S. Food and Drug Administration (FDA) concerning its Biologics License Application (BLA) for Replagal(TM) (agalsidase alfa), an investigational enzyme replacement therapy for the treatment of Fabry disease. In the letter, the FDA has asked for further explanation in several areas and requested additional data. TKT has initiated the collection of these data, but until there is an opportunity for further discussion with the FDA, TKT cannot make projections about the timing of future FDA decisions concerning the approval of Replagal.

The full text of TKT's press release issued in connection with the foregoing matter is filed as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

Item 7.      FINANCIAL STATEMENTS, PRO FORMA FINANCIAL INFORMATION AND EXHIBITS.
             ----------------------------------------------------------------

        (c)      Exhibits.

                 99.1 Press Release

                                    -2-

<PAGE>

                                 SIGNATURE

        Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: January 4, 2001                REGISTRANT

                                     TRANSKARYOTIC THERAPIES, INC.

                                     By: /s/ DANIEL E. GEFFKEN
                                         ----------------------------------
                                         Daniel E. Geffken
                                         Vice President, Finance and
                                         Chief Financial Officer

                                    -3-

<PAGE>

                               EXHIBIT INDEX

EXHIBIT NUMBER                              DESCRIPTION

99.1                                       Press Release

                                    -4-

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-99.1
<SEQUENCE>2
<FILENAME>a2034566zex-99_1.txt
<DESCRIPTION>EXHIBIT 99.1
<TEXT>


<PAGE>
```

EXHIBIT 99.1


FOR IMMEDIATE RELEASE


TKT RECEIVES FDA COMPLETE REVIEW LETTER ON REPLAGAL-TM-


CAMBRIDGE, MA, JANUARY 3, 2001 --- Transkaryotic Therapies, Inc. (Nasdaq: TKTX) today announced that it has received a complete review letter from the U.S. Food and Drug Administration (FDA) concerning its Biologics License Application (BLA) for Replagal-TM- (agalsidase alfa), an investigational enzyme replacement therapy for the treatment of Fabry disease. In the letter, the FDA has asked for further explanation in several areas and requested additional data. TKT has initiated the collection of these data, but until there is an opportunity for further discussion with the FDA, TKT cannot make projections about the timing of future FDA decisions concerning the approval of Replagal.

"While we are disappointed that the FDA did not approve Replagal at this time, we are working diligently to respond quickly to their requests for additional data," stated Richard F Selden, M.D., Ph.D., President and Chief Executive Officer of TKT. "We believe Replagal is the best hope for patients suffering from this life-threatening disease, and we remain firmly committed to bringing a safe and effective therapy to market for the thousands of patients affected by Fabry disease. We will continue to do everything we can to make this therapy available as soon as possible and we look forward to working with the FDA towards attaining this goal."

The BLA submission was based on data generated from two independent pivotal studies, conducted at the National Institutes of Health (NIH) and Royal Free Hospital in the United Kingdom, as well as long-term data from an additional six months of treatment from an open-label maintenance study at the NIH. Data from the pivotal NIH study were presented at the 50th Annual Meeting of the American Society of Human Genetics in October 2000. Data generated from the United Kingdom study will be presented at an upcoming medical meeting.

About Fabry Disease

Fabry disease is an inherited rare genetic disorder caused by deficient activity of the lysosomal enzyme alpha-galactosidase A. In patients with Fabry disease, globotriaosylceramide (Gb3) accumulates in various organs and tissues of the body due to the deficiency of alpha-galactosidase A. As a result, the deposits of this material can result in extreme pain, severe kidney damage, cardiovascular disease, and stroke. Due to its rarity and vast array of symptoms, diagnosis is often difficult and affected individuals have a significantly reduced quality of life and a greatly shortened life expectancy. TKT estimates that approximately 5,000 patients worldwide are affected by Fabry disease.

```
<PAGE>
```

About TKT

Transkaryotic Therapies, Inc. (TKT) is a biopharmaceutical company dedicated to the development and commercialization of products based on its three proprietary development platforms: Gene-Activated-Registered Trademark- proteins, Niche Protein-TM- products, and Gene Therapy. The Company's gene activation technology is a proprietary approach to the large-scale production of therapeutic proteins, which does not require the cloning of genes and their subsequent insertion into non-human cell lines. TKT's Niche Protein product platform is based on protein replacement for the treatment of rare genetic diseases, a group of disorders characterized by the absence of certain metabolic enzymes. The Company's Gene Therapy technology, known as Transkaryotic Therapy-TM-, is focused on the commercialization of non-viral, ex vivo gene therapy products for the long-term treatment of chronic protein deficiency states.

This press release contains forward-looking statements that involve a number of risks and uncertainties. For this purpose, any statements contained herein that are not statements of historical fact may be deemed to be forward-looking statements. Without limiting the foregoing, the words, "believes," "anticipates," "plans," "expects," "intends," and similar expressions are intended to identify forward-looking statements. Important factors that could cause actual results to differ materially from the expectations described in these forward-looking statements are set forth under the caption "Certain Factors That May Affect Future Results" in TKT's Annual Report on Form 10-K for the year ended December 31, 1999 and updated in TKT's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000, which are both on file with the Securities and Exchange Commission and incorporated herein by reference. These important factors include risks as to whether TKT's products, such as Replagal, will advance in the clinical trials process, the timing of such clinical trials, whether the clinical trial results will warrant continued product development, and whether TKT's products, such as Replagal, will receive approval from the U.S. Food and Drug Administration or equivalent regulatory agencies, and, if such products receive approval, whether they will be successfully marketed; the results of any patent litigation in which TKT is involved or may become involved; competition; and TKT's dependence on collaborators.

Gene-Activated-Registered Trademark- is a registered trademark and Niche Protein-TM-, Replagal-TM-, TKT-TM-, and Transkaryotic Therapy-TM- are trademarks of Transkaryotic Therapies, Inc.

Please visit our web site at www.tktx.com for additional information about Transkaryotic Therapies, Inc.

CONTACT:
Justine E. Koenigsberg
Manager, Corporate Communications
(617) 349-0271

###

</TEXT>
</DOCUMENT>

# EXHIBIT D

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3            CIVIL ACTION NO. 05-11805-NMG
 4
 5    * * * * * * * * * * * * * * * * *
      SECURITIES AND EXCHANGE COMMISSION,
 6              Plaintiff,
             vs.
 7
      RICHARD F. SELDEN,
 8              Defendant.
      * * * * * * * * * * * * * * * * *
 9
10
11         CONFIDENTIAL VIDEOTAPE DEPOSITION
12    OF THOMAS J. SCHUETZ, M.D., taken pursuant to
13    the applicable provisions of the Federal Rules
14    of Civil Procedure, before Marsha S. Gerber,
15    RPR, CSR No. 111793, and Notary Public in and
16    for the Commonwealth of Massachusetts, at the
17    offices of Securities and Exchange Commission,
18    33 Arch Street, Boston, Massachusetts, on
19    Friday, September 28, 2007, commencing at
20    9:36 a.m.
21
22
23           KACZYNSKI REPORTING
              72 CHANDLER STREET, SUITE 3
24           BOSTON, MASSACHUSETTS 02116
```

Page 3

```
 1                    I N D E X
 2    WITNESS                        EXAMINATION
 3    THOMAS J. SCHUETZ, M.D.
 4    By Mr. Huntington                5, 290
 5    By Mr. Dougherty              156, 316
 6
 7               E X H I B I T S
 8    SEC NUMBER                        PAGE
 9      38    Copy of Subpoena             4
10      39    Copy of portion of BLA      26
11      40    Copy of memo of 9/22/98     62
             to file from James Kaiser
12
13      41    Copy of letter of 12/7/98 to  66
             Dr. Schiffmann from Dr. Schuetz
14
15    SELDON NUMBER                     PAGE
16      70    Copy of document           208
17      71    Copy of CPMP Assessment Report  245
18
19
20
21
22
23    ` Exhibits retained by Attorney Huntington
24
```

Page 2

```
 1    APPEARANCES:
 2      FRANK C. HUNTINGTON, ESQUIRE
           United States Securities and
 3           Exchange Commission
           Boston District Office
 4           33 Arch Street
           Boston, Massachusetts 02110
 5           For the Plaintiff
 6      THOMAS J. DOUGHERTY, ESQUIRE
        JUSTIN J. DANIELS, ESQUIRE
 7           SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
           One Beacon Street
 8           Boston, Massachusetts 02108-3194
           For the Defendant
 9
      DAVID E. MARDER, ESQUIRE
10           ROBINS, KAPLAN, MILLER & CIRESI, LLP
           800 Boylston Street, 25th Floor
11           Boston, Massachusetts 02199-7610
           For the Deponent
12
13    ALSO PRESENT:
14      THOMAS M. LAUB, VIDEOGRAPHER
           NATIONAL VIDEO REPORTERS, INC.
15           58 Batterymarch Street, Suite 243
           Boston, Massachusetts 02110
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              PROCEEDINGS
 2
 3         (Exhibit Number SEC 38
 4    marked for Identification)
 5         THE VIDEOGRAPHER:  We are
 6    now recording and on the record.  My
 7    name is Thomas Laub.  I'm the video
 8    legal specialist for National Video
 9    Reporters.  Our business address is 58
10    Batterymarch Street, Suite 243, Boston,
11    Massachusetts 02110.  Today is
12    September 28th, 2007, and the time is
13    9:36 a.m.
14         This is the deposition of
15    Thomas Schuetz in the matter of
16    Securities and Exchange Commission,
17    plaintiff, versus Richard Selden,
18    defendant, in the U.S. District Court,
19    District of Massachusetts, Case Number
20    05-11805-NMG.  This deposition is being
21    taken at 33 Arch Street, Boston,
22    Massachusetts.
23         The court reporter is
24    Marsha Gerber of Kaczynski Reporting.
```

**Page 5**

1   Counsel will state their appearances,
2   and the court reporter will administer
3   the oath.
4       MR. HUNTINGTON: Frank
5   Huntington for the plaintiff,
6   Securities and Exchange Commission.
7       MR. DOUGHERTY: Thomas
8   Dougherty and Justin Daniels for the
9   defendant, Richard Selden.
10      MR. MARDER: David Marder
11   for the witness from Robins, Kaplan,
12   Miller & Ciresi.
13      Do I need a microphone?
14   THE VIDEOGRAPHER: No.
15   MR. MARDER: Okay.
16
17      THOMAS J. SCHUETZ, M.D.,
18   having been satisfactorily identified and
19   sworn by the Notary Public, was examined
20   and testified as follows:
21   BY MR. HUNTINGTON:
22   Q   Good morning, Dr. Schuetz.
23   A   Good morning.
24   Q   My name is Frank Huntington, and I'm an

**Page 6**

1   attorney for the Securities and
2   Exchange Commission. I'll be asking
3   you some questions this morning to
4   start with.
5      If I ask you anything that
6   you don't understand, just let me know,
7   and I'll try to do better. If you need
8   to take a break at any point, just let
9   us know, and we can go off the record.
10      First of all, I'd just like
11   to show you a document that's been
12   marked as SEC Exhibit 38. Can you take
13   a moment to look at that and tell me if
14   you've seen it.
15   A   I've not seen this.
16      MR. HUNTINGTON: Dave, can
17   we just have a stipulation that this is
18   the subpoena --
19      MR. MARDER: Sure. I'd
20   stipulate that this is a copy of the
21   subpoena that I accepted service of. I
22   did not provide it to the witness so
23   he's never seen it.
24      MR. HUNTINGTON: Okay. He

**Page 7**

1   is testifying here today in response to
2   the subpoena?
3      MR. MARDER: Yes.
4   Q   And that was a clue that you're going
5   to need to respond verbally and not nod
6   or shake your head, --
7   A   Okay.
8   Q   -- and we do need to take turns and try
9   to let me finish before you talk, and
10   I'll try to let you finish before I ask
11   the next question. It will make it
12   easier for the reporter.
13      All right. So you are here
14   in response to the subpoena. Can I --
15   Some background information. Can you
16   tell us where you live?
17   A   I live -- My address?
18   Q   Yes, please.
19   A   62 Lexington Street in Framingham,
20   Massachusetts.
21   Q   And can you briefly review for us your
22   education background after high school?
23   A   I have a -- I did a bachelor of science
24   in chemistry at Xavier University in

**Page 8**

1   Cincinnati, Ohio. And after that I did
2   M.D. and Ph.D. degrees. The M.D.
3   degree is from Harvard Medical School,
4   and the Ph.D. is in genetics from
5   Harvard University.
6   Q   Okay. And what year did you get the
7   degree from Xavier?
8   A   1983.
9   Q   And did you get both degrees from
10   Harvard in the same year?
11   A   Yes.
12   Q   And what year was that?
13   A   1993.
14   Q   And can you review for us briefly your
15   job history after that? You know,
16   where you worked and roughly what
17   years?
18   A   Including medical training?
19   Q   Yes, please.
20   A   So I was a medical resident at
21   Massachusetts General Hospital from the
22   summer of 1993 until the summer of
23   1995. I was a medical oncology fellow
24   at the Dana Farber Cancer Institute

Page 9

1  from the summer of 1995 until the
2  summer of 1998. During that time
3  period during the calendar year of 1997
4  inclusive I also was at Massachusetts
5  General Hospital again as the medical
6  chief resident, and I was -- also kept
7  my appointment at the Dana Farber
8  Cancer Institute during the calendar
9  year of 1997.
10       From the summer of 1998
11  until February of 2003 I was employed
12  at Transkaryotic Therapies, Inc. From
13  June of 2003 until November of 2006 I
14  was employed at Therion Biologics
15  Corporation. And over the past
16  approximately ten or eleven months I've
17  been self-employed as a consultant to
18  the -- as a medical consultant.
19  Q  Do you have a particular specialty or
20     area of focus as an independent
21     consultant?
22  A  No. I've been consulting to
23     principally biotech companies.
24  Q  What kinds of subjects do the biotech

1  Q  Okay. Do you know who at TKT actually
2     made the decision to make you an offer?
3  A  No.
4  Q  Okay. Now, what position did you have
5     when you started at TKT?
6  A  My title was director clinical affairs.
7  Q  Okay. And how long did you hold that
8     title?
9  A  Approximately one year.
10  Q  Did your title change --
11  A  Yes.
12  Q  -- after a year?
13     And what did it become?
14  A  In approximately the summer of 1999 my
15     title became executive director
16     clinical affairs.
17  Q  And did the title change again at some
18     point?
19  A  Yes.
20  Q  And when was that?
21  A  In approximately the summer of 2000 my
22     title became vice president clinical
23     affairs.
24  Q  Okay. Is that the title you had until

Page 10

1  companies consult you about? Just
2  generally.
3  A  Clinical trials. Clinical trial design
4     and evaluation of clinical trial data.
5  Q  And I think the reporter might
6     appreciate it if I ask you, how do you
7     spell Therion, Therion Biologics?
8  A  T-H-E-R-I-O-N.
9  Q  Okay. Now, can you -- you started --
10     you said you started working at
11     Transkaryotic Therapies. And can we
12     refer to that as TKT today?
13  A  Sure.
14  Q  Okay. And you started at TKT in the
15     summer of 1998?
16  A  Yes.
17  Q  How did you come to be hired at TKT?
18  A  In early 1998 I sent my resumé out to
19     some biotech companies. I was
20     interested in exploring careers in
21     biotech, and I had -- TKT was one of
22     the companies that I sent my resumé to.
23     And I had interviews there, and they
24     offered me a position.

Page 12

1  you left the company in early 2003?
2  A  Yes.
3  Q  Okay. Now throughout that period did
4     you have the same basic job with the
5     company?
6  A  Yes.
7  Q  Okay. Can you tell us first generally
8     what your duties were in clinical
9     affairs regardless of the precise title
10     that they gave you?
11  A  I was responsible for the clinical
12     trials that were being conducted with
13     TKT's therapeutics. Excluding the
14     products that had been partnered with
15     at the time Parks, Marion, Russell,
16     subsequently Aventis, but the products
17     -- TKT's products that were out
18     licensed were managed by the partnered
19     company. I managed the clinical trials
20     of TKT's proprietary compounds.
21  Q  Okay. And I think you used the word
22     therapeutics?
23  A  Yes.
24  Q  What does that mean in this context?

Page 93

1   some further clarification as to what
2   had happened?
3 A   Yes.
4 Q   All right. Let me show you what was
5   previously marked as SEC Exhibit 30.
6     Can you tell me if you've
7   seen SEC Exhibit 30 before?
8 A   I have, yes.
9 Q   What is SEC Exhibit 30?
10 A   It appears to be a copy of an abstract
11   that was submitted by Dr. Schiffman
12   for a scientific meeting.
13 Q   Can you tell from looking at it what
14   the scientific meeting was?
15 A   Yes. It was the American Society of
16   Human Genetics meeting in Philadelphia
17   in October of 2000.
18 Q   Did you attend some or all of that
19   meeting of the American Society of
20   Human Genetics or the ASHG?
21 A   Yes. I attended some of the meeting,
22   yes.
23 Q   And did Dr. Schiffman make a
24   presentation --

Page 94

1 A   Yes.
2 Q   -- at some point during the
3   conference?
4 A   Yes.
5 Q   Okay. And what's the connection
6   between the presentation he made and
7   this one-page document that is SEC
8   Exhibit 30?
9 A   This a document that is submitted to
10   the Society by the clinical
11   investigator for the purposes of
12   determining whether or not this
13   abstract would be accepted to be
14   presented at the meeting. This
15   abstract was accepted and was accepted
16   as an oral presentation, and
17   Dr. Schiffman gave a presentation that
18   was a more detailed presentation of
19   this abstract summary of that
20   presentation.
21 Q   And did this abstract summary, this
22   one-page document, appear in some
23   materials for the conference?
24 A   Yes.

Page 95

1 Q   Is there some sort of booklet of
2   abstracts for all --
3 A   Yes.
4 Q   -- a variety of presentations?
5 A   Yes.
6 Q   Including this one?
7 A   Yes.
8 Q   Okay. Now, do you know who actually
9   wrote the text that is the one long
10   paragraph in the center of SEC
11   Exhibit 30?
12 A   Yes.
13 Q   Who wrote that text?
14 A   Dr. Schiffmann, Dr. Selden, and I were
15   the principal authors of this.
16 Q   Did one of you prepare a first draft?
17 A   Yes.
18 Q   Who was that?
19 A   To the best of my recollection it was
20   Dr. Schiffmann.
21 Q   So Dr. Schiffmann put together a first
22   draft, and then you and Dr. Selden
23   provided comments?
24 A   Yes.

Page 96

1 Q   Okay. Do you recall any comments that
2   you provided?
3 A   Specific comments?
4 Q   Yes.
5 A   I don't recall any specific comments
6   that I provided.
7 Q   Do you recall any specific comments
8   that you understand Dr. Selden
9   provided?
10 A   I don't recall any of his specific
11   comments. I'm sorry.
12 Q   Okay. Now, in the middle of the
13   document there's some data about pain
14   at its worst scores. Do you see --
15   Right about in the middle of the
16   paragraph.
17 A   Yes.
18 Q   And there's a sentence -- there's some
19   data, and then there's a sentence that
20   says, the difference between the groups
21   was significant, P equals 0.021.
22     Do you see that?
23 A   Yes.
24 Q   Now that was one of the pain

1     calculations that we looked at earlier
2     when we were looking at the TKT003
3     portion of the BLA?
4  A  Yes.
5  Q  There were several other pain
6     calculations that we looked at also
7     that were also results of TKT003;
8     correct?
9  A  Yes.
10  Q  And this is not the one that was
11     identified at the outset as the primary
12     endpoint calculation, is it?
13        MR. DOUGHERTY:  Object to
14     the form of the question.
15  A  This --
16  Q  This -- I'll try again.
17  A  Okay.
18  Q  The particular data and P value that
19     are listed here are not the calculation
20     that was the -- designated as the
21     primary endpoint for TKT003; isn't that
22     right?
23        MR. DOUGHERTY:  Objection
24     to the form of the question.

1  Q  That's all right.
2        MR. MARDER:  You can
3     answer.
4  A  Oh, okay.  So the primary endpoint was
5     the effect on pain.
6  Q  Right.
7  A  And there were several statistical
8     analyses of that data that form the
9     primary endpoint.  This was one of
10     those.  It was not the single
11     statistical calculation that had been
12     designated as the single calculation of
13     that data.
14  Q  Right.
15        As we saw, when you were
16     looking at SEC Exhibit 39, a
17     calculation -- the area under the curve
18     calculation that ended up with a P
19     value of 0.081 was the calculation that
20     you just referred to; correct?
21  A  Yes.
22        MR. DOUGHERTY:  Object to
23     the form of the question.
24  Q  Okay.  Do you know how it came to be

1     that the only pain value that appears
2     in this abstract is the pain valve with
3     the P 0.021?
4  A  Yes.
5  Q  Can you tell us how that happened?
6  A  Dr. Selden and I discussed this many
7     times, and Dr. Selden felt that
8     presenting multiple statistical
9     analyses of the data would be too
10     confusing.  Dr. Selden thought that a
11     simpler approach to this would be
12     clearer.
13  Q  Okay.  If you are going to pick one,
14     wouldn't it make sense to pick the one
15     that was designated as the primary
16     calculation, the area under the curve?
17        MR. DOUGHERTY:  Object to
18     the form of the question.
19  A  Yes.
20  Q  Do you have an understanding as to why
21     that was not -- Strike that.
22        Did you express any view on
23     that subject to Dr. Selden?
24  A  Yes.

1  Q  What did you say to him and what did he
2     say to you?
3  A  I told him that we should present the
4     three main statistical analyses and
5     explain them as such.
6  Q  And what did he say?
7  A  He said that we should just present
8     this one.
9  Q  Now, a little bit further down there's
10     a reference to renal glomerular.  See
11     if you can find that with a P value of
12     less than 0.01.  It's about a third of
13     the way from the bottom.
14  A  Yes.
15  Q  Is that one of the four kidney scores
16     that we talked about earlier that
17     involved glomerular?
18  A  Yes.
19  Q  This is only one of the four.  Was
20     there any discussion about putting all
21     four in the abstract?
22  A  Well, these abstracts have quite a
23     strict word limit so it's not really
24     possible to do that.  So this is just

**Page 145**

1   mentioned, were you at any other
2   discussions about what data should or
3   should not be in the article?
4 A   We had -- we had numerous discussions
5   about that. Dr. Selden and I
6   probably -- I mean, we reviewed drafts
7   of this many, many times.
8 Q   I take it you disagreed with Dr. Selden
9   about which of the pain measure -- pain
10   calculations should be in the article?
11      MR. DOUGHERTY: Object to
12   the form and lack of foundation.
13      MR. HUNTINGTON: Okay.
14 Q   You can answer.
15 A   We -- we discussed how much of the data
16   should -- from the study should go in
17   here. There was an enormous amount of
18   data generated in the study, and there
19   were I believe a couple of different
20   publications that came out of the study
21   I think. So some of the data went in
22   some papers, some went in others. So
23   how we sort of -- that was the
24   substance of those discussions.

**Page 146**

1 Q   Did you have any understanding of who
2   made the final call as to which data
3   would be in or not in the article as
4   to --
5 A   Oh, Dr. Selden made the final call.
6 Q   Okay. I'd like to show you what was
7   previously marked as Selden Exhibit 36.
8      Dr. Schuetz, have you seen
9   Selden Exhibit 36 before?
10 A   Yes.
11 Q   Can you tell us what it is?
12 A   It is the FDA's so-called briefing
13   document in preparation for an FDA
14   advisory committee meeting that had
15   been scheduled for September of 2002 to
16   discuss the potential -- to discuss the
17   data and possible approval of Replagal.
18   This document contains FDA's complete
19   summary of all of the data that we
20   submitted to them at that time.
21 Q   Okay. And the date on the document
22   appears to be August 26th, 2002.
23      Do you see that?
24 A   Yes.

**Page 147**

1 Q   Is that about the time that you
2   received it?
3 A   Yes.
4 Q   And what was your understanding of how
5   an advisory committee meeting relates
6   to the overall process of FDA approval?
7 A   Well, at the FDA advisory committee
8   meeting the company would give a
9   presentation and the FDA would give a
10   presentation, and this presentation is
11   in front of a panel of experts to whom
12   are given a number of questions on
13   which they need to opine. And when
14   they do so, the FDA advisory
15   committee's recommendations are then
16   given to FDA as to whether or not they
17   recommend the ultimate approval of the
18   drug. FDA can take their advice or
19   not. FDA generally takes the advice of
20   the advisory committee in general.
21 Q   Now, after you received Selden
22   Exhibit -- Well, first of all, how did
23   you get a copy of Selden Exhibit 36?
24 A   I don't remember how I got the copy,

**Page 148**

1   but it was given to me in preparation
2   for the advisory committee.
3 Q   And at the time you got it the
4   expectation was that the advisory
5   committee would meet the next month,
6   September of 2002?
7 A   Yes. It was scheduled for September of
8   2002.
9 Q   And the company had an opportunity to
10   submit its own briefing book and
11   prepared one a few weeks later; is that
12   right?
13 A   No. We -- I think we submitted ours
14   before we got this I think. Our -- we
15   needed -- I'm pretty sure the
16   requirement is to submit it about a
17   month ahead.
18 Q   Okay.
19 A   So I -- Do we have that document?
20 Q   I apologize. I do not have it in front
21   of me. Mr. Dougherty may.
22      MR. DOUGHERTY: We'll get
23   it for you.
24 Q   I have it upstairs. We'll figure it

Page 149

1   out.
2 A   It would have been submitted in this
3    general time frame. I don't remember
4    the exact date.
5 Q   Now, did you -- did you actually
6    attend -- When did the advisory
7    committee meeting actually take place?
8 A   The advisory committee meeting for
9    which this briefing document was
0    prepared was ultimately canceled, and
1    it was rescheduled for January of 2003.
2 Q   Did you attend?
3 A   Yes.
4 Q   Did you make a presentation?
5 A   Yes.
6 Q   Did your presentation include any
7    reference to the pain data --
8 A   No.
9 Q   -- that TKT had assembled?
0 A   No.
1 Q   Had there been a discussion beforehand
2    about whether or not to include pain
3    data at that presentation?
4 A   Yes.

Page 150

1 Q   Who did you have that discussion with?
2 A   There were many, many, many
3    discussions. I have no idea how many.
4 Q   Okay.
5 A   People involved in those discussions
6    were Nancy Buc, myself, Neil Kirby, and
7    Dr. Selden at minimum.
8 Q   Okay. What view did you express on the
9    subject of whether or not to include
10    references to pain during the
11    presentation?
12 A   I felt quite strongly that we needed to
13    present our pain data.
14 Q   And why was that?
15 A   Because the pain data was the primary
16    endpoint in one of the main controlled
17    studies that we did, and I thought that
18    it was really important to present the
19    results of the study as conducted. I
20    felt very strongly about that for two
21    reasons. The first is I knew FDA was
22    going to present it, and the second
23    was, if we simply ignore our primary
24    endpoint data, I felt and I argued that

Page 151

1   the advisory committee would
2    potentially question our credibility
3    as, you know, clinician scientists. It
4    would bear on our credibility.
5 Q   Do you recall whether Nancy Buc
6    expressed an opinion on whether or not
7    pain data should be included?
8      MR. MARDER: I'm going to
9   object to any conversations with Nancy
10   Buc on the grounds of attorney-client.
11      I instruct you not to
12   answer.
13      MR. HUNTINGTON: Okay. I
14   think they waived, the company's waived
15   that, but we can leave it at that.
16   That's all right.
17      MR. DOUGHERTY: Well, no.
18   We affirmatively sought and that was
19   waived at our request, and we are
20   relying on testimony in this case from
21   Nancy Buc.
22      MR. MARDER: Okay. Well,
23   the company may have waived a privilege
24   that it has with its counsel, but if

Page 152

1   he -- if she was acting -- well, --
2      MR. HUNTINGTON: Tom's
3   right. There was a supplemental
4   production from the company with
5   documents that related to her files
6   that had been withheld before the
7   waiver.
8      MR. DOUGHERTY: Relatedly,
9   Michael Astrue has given testimony in
10   this matter a couple weeks ago
11   inclusive of his, --
12      MR. HUNTINGTON: Yeah.
13      MR. DOUGHERTY: -- and I
14   will be asking questions, for example,
15   about each of those, with respect to
16   conversations with each of those.
17      MR. MARDER: All right.
18   Well, to the extent -- if the
19   corporation has waived any privilege
20   relating to communications with Nancy
21   Buc, is that what you guys are
22   representing?
23      MR. HUNTINGTON: Yes.
24      MR. MARDER: And if that's

**Page 153**

1    the case and he was talking to Mrs. Buc
2    in his capacity as an employee of TKT,
3    then on that basis then he can testify.
4  A  I'm sorry, I forgot the question.
5  Q  The question was just, on the subject
6    of whether or not to include pain as
7    part of the company's presentation at
8    the advisory committee meeting do you
9    recall whether Nancy Buc expressed a
10   view one way or the other?
11 A  It is my recollection that she
12   generally agreed with the point I was
13   making about our credibility as
14   clinician scientists.
15 Q  Do you recall whether Dr. Kirby
16   expressed an opinion one way or the
17   other?
18 A  I don't recall.
19 Q  And Dr. Selden, what opinion did he
20   express?
21 A  Dr. Selden felt very strongly that we
22   should not present the data for pain.
23 Q  He did.
24        Did he say why he felt that

**Page 154**

1    should be the case?
2  A  Yes. He said that it would precipitate
3   a shareholder lawsuit if we were to
4   present the pain data because we had
5   not ever disclosed the analysis of the
6   AUC result analysis.
7  Q  And that's the AUC standing for area
8   under the --
9  A  Area under the curve. Yes. I'm sorry.
10 Q  Okay. And who had the final vote on
11   whether or not pain would be included
12   as part of the presentation?
13 A  Oh, Dr. Selden did.
14 Q  Did you ever -- in that time frame did
15   you have any discussions with
16   Dr. Selden about the slide presentation
17   you had given at the ASHG conference?
18 A  Yes.
19 Q  Can you tell us what happened in that
20   conversation?
21 A  I reminded Dr. Selden that we had
22   presented the statistical analysis of
23   the primary endpoint data with the
24   repeated measures P value of .021 on

**Page 155**

1    the slide that I had presented.
2  Q  Okay. And how did it come to be that
3   you were reminding him about that
4   during this conversation?
5  A  We -- one of the discussions in the
6   week before the advisory committee
7   unfortunately -- the discussion of
8   whether or not we should include pain
9   in the advisory committee unfortunately
10   was a little heated, and Dr. Selden
11   asked me to come to his office where
12   the two of us had a meeting just the
13   two of us where he -- I told him that
14   in terms of a shareholder lawsuit,
15   having the advisory committee go poorly
16   would be a much worse thing than that
17   because, if the advisory committee went
18   poorly, Replagal was not going to be
19   approved in all likelihood.
20       And Dr. Selden indicated to
21   me that he was unaware that we had
22   ever -- he first said to me that he was
23   unaware that the area under the curve
24   analysis was not positive, and he

**Page 156**

1    suggested to me that I had told him
2   that. He also suggested to me that he
3   was unaware that we had presented the P
4   value on the slide at the ASHG meeting
5   and that he was unaware at the time.
6   He was aware of it in January of 2003
7   when we were talking, and I reminded
8   him that that was a preposterous
9   assertion.
10 Q  Okay. Did he respond after you
11   reminded him?
12 A  Not really.
13 Q  Was that the end of your discussion on
14   this particular topic?
15 A  Pretty much.
16       MR. HUNTINGTON: I don't
17   have any other questions.
18
19       EXAMINATION
20 BY MR. DOUGHERTY:
21 Q  Just picking up on that,
22   Dr. Schuetz, --
23 A  This?
24 Q  No, just picking up on the last

**Page 157**

1   questions there. Just leave that
2   there.
3      Picking up on the last
4   questions from Mr. Huntington, do you
5   recall with respect to a question of
6   TKT pursuing pain at the advisory
7   committee as a basis for the approval
8   of Replagal that in October 2002, so
9   two months before, two or three months
10   before the January conversation that
11   you just eluded to, in October 2002 TKT
12   had publicly announced by press release
13   that it would not be pursuing pain as a
14   basis before the advisory committee for
15   the approval of Replagal?
16 A   Yes.
17 Q   And TKT had told shareholders and the
18   public that it would not be doing so in
19   that press release; correct?
20 A   Yes.
21 Q   And, in addition, you'd agree that the
22   briefing book materials, both TKT's and
23   the one you have in front of you, the
24   FDA briefing book, as revised obviously

**Page 158**

1   because, as you recall, it got revised
2   over the fall before the January
3   meeting -- Correct?
4 A   Did I -- I'm sorry, I didn't understand
5   what it was --
6      MR. MARDER: Object to
7   form.
8 Q   We'll go back.
9 A   -- in your sentence. I'm sorry.
10 Q   We'll go back.
11      Do you recall that in
12   connection with the -- I'll simplify.
13      Do you recall in connection
14   with the advisory committee in January
15   that the FDA's briefing book on the
16   Replagal product itself would become
17   public?
18 A   I'm really sorry, I didn't understand
19   the question. Do I --
20 Q   Yes.
21      Do you recall that the
22   document that the FDA prepared, its
23   briefing book, --
24 A   Yes.

**Page 159**

1 Q   -- would become public at the point of
2   the advisory committee meeting? Do you
3   recall knowing that?
4 A   Yes.
5 Q   And so whatever the various measures
6   were that were referred to in the
7   briefing book, including area under the
8   curve, would become public as part of
9   the advisory committee?
10 A   Yes.
11 Q   And you knew that to be the case, for
12   example, even at the time that the
13   advisory committee was scheduled for a
14   September advisory committee, that in
15   connection with the advisory committee
16   meeting, whenever it happened, the data
17   would become public that is in the
18   FDA's briefing book?
19 A   Yes. That was not the question he
20   asked though.
21 Q   I understand.
22 A   Okay.
23 Q   So at the point that Dr. Selden had a
24   reference to a possibility of a

**Page 160**

1   shareholder lawsuit in a conversation
2   with you in January of 2002, TKT had
3   already publicly -- January 2003,
4   sorry. Strike that again.
5      At the point that
6   Dr. Selden had a conversation with you
7   in January 2003 about the possibility
8   of shareholder lawsuit, TKT had already
9   told the public and shareholders that
10   it was not going to pursue pain in an
11   October press release, correct, as a
12   basis for approval of Replagal?
13 A   Yes, that's correct.
14 Q   Okay. So let me go back then.
15      Just starting back at the
16   beginning of questions that
17   Mr. Huntington asked you, he asked you
18   about the possibility of a surrogate
19   approval, and I think that what you
20   said was, and correct me if I'm wrong,
21   that it's a -- its surrogate is part of
22   a specific regulatory pathway that
23   potentially provides for approval
24   faster than showing a clinical benefit

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            :
SECURITIES AND EXCHANGE COMMISSION,         :
                                            :
                        Plaintiff,          :
                                            :
            v.                              :        Civil Action No.
                                            :        05 CV 11805 NMG
RICHARD F. SELDEN,                          :
                                            :
                        Defendant.          :
_____:


[PROPOSED]
ORDER BARRING DEFENDANT RICHARD F. SELDEN
FROM ACTING AS AN
OFFICER OR DIRECTOR OF A PUBLIC COMPANY

Plaintiff, the Securities and Exchange Commission ("Commission"), having filed

a Complaint in this action on September 1, 2005; defendant Richard F. Selden having

consented on April 16, 2008 to entry of a final judgment; a final judgment having been

entered on July 8, 2008; and the Court having considered the Commission's motion for

entry of an order barring Selden from acting as an officer or director of a public

company:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that, pursuant to

Section 20(e) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §

78u(d)(2)], Selden is barred for a period of five years from acting as an officer or director

of any issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section

15(d) of the Exchange Act [15 U.S.C. § 78o(d)].


       DONE AND ORDERED at Boston, Massachusetts, this _____ day of

_____, 2008.


_____
UNITED STATES DISTRICT JUDGE